## W. H. CASON, FIDELITY AND DEPOSIT COMPANY OF MARYLAND ET AL v. W. J. LEVERETTE

73-59                                              502 S.W. 2d 459

Opinion delivered December 24, 1973

*Sloan & Sloan* and *Wright, Lindsey & Jennings,* for R. H. White, Mary Rose White and Fidelity & Deposit Co. of Md.

*Sharpe & Long,* for appellee W. J. Leverette.

*Henry Wilkinson* and *Rubens & Rubens,* for appellant-appellee W. H. Cason.

CONLEY BYRD, Justice. This litigation arises out of the refusal of appellants R. H. White and Mary Rose White to vacate lands belonging to appellant and cross-appellee W. H. Cason after the expiration of a written lease.

The record shows that R. H. White and his wife Mary Rose White are substantial land owners in St. Francis County. In addition to farming the 1500 acres owned by them, they, for a number of years, have rented other land including Cason's 240 acres. Up until some seven years before this litigation, appellee W. J. Leverette had worked as a hired hand for the Whites and in that capacity had farmed the Cason land. The lease under which the Whites farmed the Cason land expired on December 30, 1970. During the spring of 1970, Cason and Leverette started negotiations which ultimately resulted in a two year written lease dated March 1, 1971. That the negotiations between Cason and Leverette had re-

sulted in a contract between the two during 1970, is evidenced by a letter from Cason's counsel to White under date of December 23, 1970. Cason's unlawful detainer action against White resulted in 'judgment under date of April 29, 1971, against White for possession and for damages in the amount of $3,583.33. White promptly filed a notice of appeal and filed a supersedeas bond with appellant Fidelity and Deposit Company of Maryland as the corporate surety. The Whites continued in possession after the supersedeas was filed and made and harvested a bean and a rice crop from the land, but neglected to file the appeal from the unlawful detainer action in time for this Court to take jurisdiction. The Whites satisfied the $3,583.33 judgment, returned possession to Cason and offered a $7,000.00 check in full settlement of all liability.

This litigation was commenced when Cason brought action No. 7432 against the Whites and their supersedeas surety seeking double the rental value for the time from May through December. Leverette then brought an action (cause No. 7438) against Cason claiming damages by the way of lost profits upon his rental contract. The Whites and their supersedeas surety were vouched into this action by Cason. By agreement the two actions were consolidated for trial. The jury upon interrogatories found that Cason was liable to Leverette in the amount of $10,000.00 for his loss of profits and that the Whites were liable to Cason in the amount of $7,000.00. Upon motions by Cason the trial court set aside the $7,000 verdict in favor of Cason and granted a judgment N.O.V. in favor of Cason against the Whites and their supersedeas surety for the $10,000 Leverette verdict together with an attorney's fee in the amount of $1,000. For reversal the several points hereinafter discussed are raised.

POINT NO. 1. The Whites and their supersedeas surety here contend that the first action is res judicata of the issues here involved and that the filing of cause No. 7432 by Cason amounts to the splitting of a cause of action. We do not agree. In the first place the issue of double damages was raised in the first action and

thus the holding in *Coley* v. *Westbrook*, 208 Ark. 914, 188 S.W. 2d 141 (1945), is not applicable. Furthermore, we held in *Dover* v. *Henderson*, 197 Ark. 971, 125 S.W. 2d 798 (1939), that the liability of a principal and surety on a supersedeas bond in an unlawful detainer action for damages subsequent to the entry of the judgment for possession should be tested by an action at law on the bond.

POINT NO. 2. The Whites contend that the court erred in not permitting them to introduce evidence to show that their refusal to vacate was not willful. They also complain that the court erred in instructing the jury that their holding over was willful. Their proffer of proof on this point concerned only evidence that was either presented or should have been presented in the first trial. The trial court properly held that these issues were concluded by the first trial.

POINT NO. 3. The Whites say that Leverette's claim for loss of profits should have been dismissed because his proof on the issue was speculative and conjectural. We do not agree.

The record shows that Leverette was a man of little or no formal education. He was farming 240 acres of land only one quarter of a mile from the Cason land, and, for four of the years he had worked for White, he had farmed the Cason lands. Leverette testified that as he saw the two properties they were identical. On the 48.5 acres of rice that he farmed he made 5,090.44 bushels of rice for a total value of $13,498.07. On the 175 acres of bean land he made 4,621.33 bushels for a total value of $14,336.61. He testified that his total cost of making the two crops was $9,000. Without benefit of records he itemized from the witness stand $8,100 of the costs of making the crops on the lands he farmed. He then took his yield per acre and by multiplying that against the bean and rice allotments on the Cason lands arrived at the total values he would have received had he been permitted to farm the Cason land. Leverette then arrived at what the expenses would have been in making the crop by determining his per acre cost of making the

same crops on the lands he did farm. He also showed that he had acquired the necessary tractors and combines to farm the land before the trial of the first action. Not only White but each witness he called testified that Leverette was a good farmer. Leverette testified he would have made 104 bushels of rice per acre on the Cason land. The Whites admittedly harvested around a hundred bushels per acre.

Leverette testified without contradiction that there was no other land for rent at the time the supersedeas was executed. While there is other evidence on behalf of the Whites that would raise issues as to Leverette's credibility, we cannot say here that the evidence as to lost profits was so speculative or conjectural that a jury issue was not made. At least the evidence meets the standard laid down in *Crow v. Russell,* 226 Ark. 121, 289 S.W. 2d 195 (1956).

Notwithstanding that the issue of Cason's liability for loss of profits by Leverette was submitted to the jury upon instructions submitted by White over Cason's objections, the Whites now apparently argue that such profits are not an element of damages for the breach of lease. Cason also makes the same argument but concedes the issue is harmless or should be waived as to him if the judgment over against the Whites is sustained. Our cases on the issue have reached different results. In *Thomas v. Croom,* 102 Ark. 108, 143 S.W. 88 (1912), and *Brown v. Bradford,* 175 Ark. 823, 1 S.W. 2d 14 (1927), we held that loss profits were not an element of damages. In *Harmon v. Frye,* 103 Ark. 584, 148 S.W. 269 (1912), *Black v. Hogsett,* 145 Ark. 178, 224 S.W. 439 (1920), and *Crow v. Russell,* 226 Ark. 121, 289 S.W. 2d 195 (1956), we permitted the recovery of lost profits for breach of a lease agreement. Our cases in allowing or disallowing lost profits as an element of damages on a lease contract do not explain why a lease contract ought to be treated any differently from any other type of contract in which loss of prospective profits is allowed. See *Williams v. Hildebrand,* 220 Ark. 202, 247 S.W. 2d 356 (1952). However, we need not decide here whether lost profits are a compensable element of damages for we have consistently held that a party who requests or

acquiesces in an instruction submitting a particular issue to the jury is not in a position to thereafter complain, *Farmers Co-op Assn'n Inc.* v. *Garrison,* 248 Ark. 948, 454 S.W. 2d 644 (1970). The record here demonstrates that during the trial neither White nor Fidelity raised the compensability of lost profits as an element of damages. On the other hand the record demonstrates that the issue was submitted to the jury upon an instruction requested by White and without objection on the part of Fidelity. Cason has waived the issue here by stipulation.

POINT NO. 4. The Whites argue that Leverette is not entitled to recover damages for breach of his lease convenant, because he knew White was in possession when the lease was executed. We pointed out in *Morrison* v. *Weinstein,* 151 Ark. 255, 236 S.W. 585 (1921), that the possession or holding over of a prior tenant did not prevent a recovery by a tenant against a landlord upon a contractual covenant to give possession, for the liability grows out of the covenant.

POINT NO. 5. The Whites here contend that the trial court erred in rendering judgment non obstante verdicto in favor of Leverette against White in the Leverette v. Cason case No. 7438.

In making this argument they contend only that the issue was a fact one for the jury. We do not agree. As pointed out in *Garrott* v. *Kendal,* 212 Ark. 210, 205 S.W. 2d 192 (1947), a landlord is acting within his rights to execute a lease to another tenant. One who, by his wrongful detention, causes the landlord to become liable to a tenant, such as Leverette, renders himself liable for the damages recovered of the landlord as a matter of law.

POINT NO. 6. Neither do we find any merit in the White's contention that the trial court erred in setting aside the $7,000 damage verdict in favor of Cason. The proof showed that the Whites had tendered a $7,000 check in full payment of the 1971 rent. Also the trial court had instructed the jury that the Whites were liable for double the rent value but that their corporate surety

was only liable for the rent value. When the jury returned the $7,000 verdict, it was reasonably apparent to the trial court that the jury had become confused between the two instructions. When we consider that the trial court not only had the advantage of seeing the parties but heard the arguments of counsel, we cannot say that he abused his discretion in setting aside the verdict.

POINT NO. 7. We find no merit in the contention that the court erred in awarding an attorney's fee as damages to Cason in defending the suit by Leverett. See *Garrott* v. *Kendal, supra.* Neither do we find the $1,000 fee excessive for defending the action.

Affirmed.

JONES, J., dissents.

J. FRED JONES, Justice, dissenting. I do not agree with the majority opinion in this case. I would reverse the judgment in favor of Leverette.

In the first place, when Leverette entered into the written lease with Cason on March 1, 1971, he did so with his eyes wide open to the unlawful detention action then pending between Cason and White. White's written lease with Cason terminated on December 30, 1970, but he was still in possession of the land on March 1, 1971, and Leverette was bound to have known that the contest between Cason and White was for a determination of whether White had rented the land for 1971, or whether Cason was entitled to immediate possession. Leverette agreed to pay rent not in dollars and cents but in bushels of rice and soybeans whether he planted or raised anything on the leased land or not. It is my view that Leverette practically invited such damages as he may have sustained in this case and that he should bear at least some of the consequences of his own actions. That, however, is not the basis of my dissent.

It is my view that Leverette simply failed to prove the damages awarded him by competent evidence in a case

of this kind. He based his damages on what he said his *profits* would have amounted to from the Cason land had it been available to him on March 1, 1971. It is my view that evidence as to prospective profits from annual crops *not* raised on leased lands is entirely too speculative and uncertain to constitute competent and admissible evidence in measuring damages for breach of contract for the lease or rental of such lands.

In arriving at the profits he would have made on the Cason land, it is true, as pointed out by the majority, Leverette did itemize, without benefit of records, his cost of making a crop on other lands he farmed. That is one of the difficulties I find in the admissibility of such evidence. It could be totally self-serving and immune to successful challenge. If the market price of rice should go down and the market price of soybeans should increase during the crop year, there would be nothing to prevent such tenant out of possession from testifying he intended to plant all the land in soybeans and collect his damages on that basis. As I view the majority opinion, it would open the door to proof of prospective profits from the highest and best use of land intended by the tenant as the measure of damages for breach of a farm lease.

I would still adhere to the principle announced as early as 1883 in the case of *Rose* v. *Wynn,* 42 Ark. 257. In that case Rose leased a hotel to Wynn but was unable to deliver possession because a tenant was holding over under a former lease and was successfully resisting eviction under a retention bond. In proof of damages Wynn offered evidence as to the difference he paid for boarding his family and what it would have cost to live in the hotel had possession been delivered to him. In rejecting this evidence as too conjectural and uncertain this court said:

"The books agree that in an action by a lessee against a lessor for damages for refusal or failure to deliver possession of the demised premises the general rule for the measure of damages is the difference between the rent reserved and the value of the premises for the term.

If the value of the premises for the term is no greater than the rent which tenant has agreed to pay, then the latter is not substantially injured, and can in general recover only nominal damages, though the landlord without just cause refused to give possession. But if the value of the premises is greater than the rent to be paid, the lessee is entitled to the benefit of his contract, and this will ordinarily consist of the difference between the two amounts. *Adair* v. *Boyle*, 20 Iowa 242; *Trull* v. *Granger, 4 Selden, (New York Court of Appeals)*, 115; 3 *Sutherland on Damages*, 150; *Green* v. *Williams*, 45 Ill. 206; *Dean* v. *Roesler*, 1 *Hilton* 422.

It seems, also, from the current of adjudications, that if other damages have resulted *as the direct and necessary or natural consequence of the defendant's breach* of the contract, these are also recoverable. For example, if plaintiff in good faith, and relying on the contract, has made preparation to take possession, and these have been rendered useless by the defendant's refusal to comply with his contract, the authorities hold that there may be a recovery for the loss thus sustained." (My emphasis).

I do not contend that in no case can loss of future profits from leased premises be recovered as an element of damages for breach of the lease, but the key words of distinction are those I have emphasized in the above quote from *Rose* v. *Wynn*. In *McElvaney* v. *Smith*, 76 Ark. 468, 88 S.W. 981, we said:

"When a landlord unlawfully evicts a tenant from the premises, the tenant is entitled to recover as damages whatever loss results to him *as a direct and natural consequence of the wrongful act* of the landlord. If the rental value of the place from which he is evicted is greater than the price he agreed to pay, he may recover this excess and, in addition thereto, any other loss *directly caused by the eviction*, such as the expense of removal to another place." (My emphasis).

In *Thomas* v. *Croom*, 102 Ark. 108, 143 S.W. 88, the

pertinent facts were almost identical to those in the case at bar and in that case we said:

"The measure of damages for the breach of this implied covenant for possession is the difference between the rental value of the demised premises and the rental price named in the lease, together with such special damages as have necessarily resulted from such breach. * * * The probable profits to a lessee from the cultivation of demised land is not the true measure of his damages resulting from the breach of a covenant for possession, and can not be considered in determining the amount of such damages."

In *Reeves* v. *Romines,* 132 Ark. 599, 201 S.W. 822, Reeves rented land from Romines and was enjoined from cultivating the land in an action brought by Esmonds to whom the land had already been rented for the particular crop year involved. Reeves sued for $600 damages based on the profits he would have made from crops on the land. On the basis of *McElvaney* v. *Smith* and *Thomas* v. *Croom, supra,* we affirmed the trial court in sustaining the demurrer to the complaint.

As already stated, I do not contend that lost profits may not be considered *in any case* for breach of contract for the lease of land or buildings, but I do contend that such lost profits must be ascertainable and result as a direct and natural consequence of the wrongful act and must be proven by evidence free of speculation and conjecture. For example, in the operation of a soda fountain future monthly profits may reasonably be estimated on past monthly profits. *Black* v. *Hogsett,* 145 Ark. 178, 224 S.W. 439. In an egg ranch or a dairy operation, it would appear that daily or monthly profits could be easily and accurately ascertained by simple daily records and such profits could reasonably be projected into the future with some degree of accuracy; but it is my view, that the profits to be derived from rice and soybean farming are an entirely different matter.

It is my view that there are so many hazards and variables controlling the profits any one individual will

derive from rice and soybean farming, or from any other annual field crop production, it would be next to impossible to predict, with any degree of accuracy, the *profits* he would have made from land he did not plant or cultivate, and to prove the amount of such profits without speculation and conjecture.

It is my opinion that the profits Mr. Leverette said he did make on the lands he did farm should not have been accepted in evidence as to profits he would have made on other lands he did not plant or cultivate; and I would reverse the judgment in favor of Leverette and remand for a new trial as to any actual damages, including special damages, he may have sustained as the direct and natural consequence of any wrongful acts of Cason.